[Civ. No. 21595. Second Dist., Div. Two. Apr. 25, 1956.]

LEOPOLDINE VOSS et al., Respondents, v. JOHN RAY-
MOND FRIEDGEN et al.; Appellants.

Burke Mathes for Appellants.

LeSage & Bowman and Ray M. Steele for Respondents.

ASHBURN, J.—Plaintiffs Leopoldine Voss, Edna Fournier and Helen Voss Wolsky recovered judgment against defendants John Raymond Friedgen, Olga Donato Lindenberg and Alvin T. Dickens for sums aggregating $4,950 (principal amount), being moneys paid to defendants in transactions held to be in violation of the Corporate Securities Law (Corp. Code, § 25000 et seq.) on the part of defendants. Defendant Lindenberg did not appeal. The other defendants have brought the case to this court. Essentially their arguments go to the sufficiency of the evidence to sustain the findings.

The complaint contains only common counts, but the gravamen of each cause of action, as shown by the evidence, is a negligent fraud within the purview of *Mary Pickford Co.* v. *Bayly Bros., Inc.*, 12 Cal.2d 501, 525-526 [86 P.2d 102] (discussed below); under established practice in this state fraud may be proved under that general type of allegation. (*Minor* v. *Baldridge*, 123 Cal. 187, 190 [55 P. 783]; *Adams* v. *Harrison*, 34 Cal.App.2d 288, 293 [93 P.2d 237].) That was done at bar without objection. The findings are in the general language of the complaint, a permissible procedure. (*Rauer's Law etc. Co.* v. *Bradbury*, 3 Cal.App. 256, 260 [84 P. 1007]; *Gantner & Mattern Co.* v. *Hawkins*, 89 Cal.App.2d 783, 786 [201 P.2d 847].) In this situation it is deemed that "[t]he court impliedly found in accordance with the evidence presented by the prevailing party." (*Cherry* v. *Hayden*, 100 Cal.App.2d 416, 421 [223 P.2d 878].) See also *Broadway Fed. etc. Loan Assn.* v. *Howard*, 133 Cal.App.2d 382, 396 [285 P.2d 61]. Therefore, the reviewing court must determine whether the evidence supports implied findings which the trial judge is presumed to have made upon the basis of the evidence most favorable to respondents' cause. We heartily agree, however, with all that the Presiding Justice says on this subject in his concurring opinion.

Appellants' opening brief assumes and asserts that the transactions in question were but loans to defendants' corporation (D. F. D. Production), represented by ordinary promissory notes. In his reply brief, however, counsel undertakes to offset the argument of respondents' counsel that plaintiffs' money was taken in a series of sales of corporate securities without a permit therefor. It is to be remembered that a claim of

insufficiency of the evidence "requires defendants to demonstrate that there is no substantial evidence to support the challenged findings. As was stated in the oft-cited case of *Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, at page 429 [45 P.2d 183] : '. . . the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' which will support the findings, and when 'two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' " (*Nichols* v. *Mitchell*, 32 Cal.2d 598, 600 [197 P.2d 550].)

 The trial judge was free to reject all or any part of the testimony of any witness which did not ring true, and to draw such reasonable inferences favorable to plaintiffs' case as he saw fit. "Unless it clearly appears that upon no hypothesis whatever is there substantial evidence to support a finding of the trier of fact, it cannot be set aside on appeal." (*Murphy* v. *Ablow*, 123 Cal.App.2d 853, 858 [268 P.2d 80].) Upon this basis we reconstruct the implied findings presumptively made by the trial court.

The three defendants were the promoters and sole officers and directors of a California corporation known as D.F.D. Production, which was formed for the purpose of producing and distributing motion pictures. No stock was ever issued and no application was made or permit granted therefor until after the subject transactions between plaintiffs and defendants had occurred. Each of the three individual defendants had undertaken to raise money for the corporation. Dickens' mother-in-law had put in $3,500 for him and the corporation had been advertising for funds. Dickens was on friendly terms with Mrs. Leopoldine Voss and her two daughters, Edna Fournier and Helen Voss Wolsky (who, for the sake of brevity, will be referred to as Mrs. Voss, Edna and Helen). Dickens was a real estate broker and as such had handled transactions for the Vosses, and in one instance had invested $1,000 for Helen, yielding a profit of $73 from an investment the nature of which she did not know. The Dickens family and the Voss family were "very good friends." In July, 1947, he visited the Voss home and talked with Edna about investing some money in a motion picture enterprise. He himself testified: "Q. During the summer of 1947, did you approach any members of that family concerning getting some money to invest in D.F.D. Productions? A. Yes, I did." Mrs. Voss was at

home in the kitchen and Edna called to her to know whether she had any money to invest; she wanted to know if it was good; Dickens told them the Bank of America had backed the picture for $25,000 and he had put some money in; they trusted him as a friend and decided that the three of them, Mrs. Voss and the two daughters, had $3,500 which they would put in, whereupon Dickens offered them a return of $4,500 by November 1, 1947. Though he later attempted to give the complexion of a loan to the transaction, it was presented to the plaintiffs on the basis of investment, not loan. On July 15, 1947, Edna handed Dickens $1,500 in the Voss home and he wrote a receipt whose language is well-nigh unintelligible but is suggestive of a loan with a bonus of "its interest or profit."[1] On August 19th Mrs. Voss and Helen each delivered $1,000 to Dickens but he gave them no receipt. This made up the $3,500 which the three women had agreed to invest. It is true that at times they spoke of these moneys as loans in their testimony, but the trial judge was not bound to accept their conclusion or to refuse to look through the form of the transaction to its substance. Indeed, these ladies showed such lack of understanding of the transaction as to bring them clearly within the class of persons for whose protection the statute was enacted. When their trusted friend, Dickens, called it a loan, they called it one; when he called it a right to one per cent interest in the profits, they called it that; as one of them phrased it, "we just trusted—took his word for it. That is all." In *People* v. *Sidwell*, 27 Cal.2d 121, 126 [162 P.2d 913], the Supreme Court said: "The understanding or misunderstanding of the parties as to the nature of the transaction is not determinative of its legal effect. However innocent in one sense may have been the defendants' intentions, their acts in entering into the contract were deliberate and it is by their acts and the language of the Corporate Securities Act that we must judge the legal consequences of those acts and the sufficiency of the evidence to sustain the judgment."

On August 28, 1947, the Corporation Commissioner issued a "Desist and Refrain Order" directing the corporation and each of the defendants "not to sell or offer for sale, negotiate for the sale of, nor deal in any of the capital stock or other securities of D. F. D. Corp., for the reason that . . . the sale

[1] "Los Angeles, Calif. July 15 - 1947 Received of Edna Fournier the Sum of $1,500 to apply on loan to D. F. D. Productions agreement to follow in form of note as Security signed by officers of D. F. D. Productions plus its intrest or profit Alvin T. Dickens."

thereof is and would be unfair, unjust and inequitable to the purchaser thereof and in violation of the Corporate Securities Act.''

Two or more weeks after August 19, 1947, Dickens brought a promissory note to Mrs. Voss in the amount of $4,500, dated August 1, 1947, and payable November 1, 1947. August 1 was an arbitrary date, nothing had occurred on that day. The $1,500 was delivered on July 15, and the other $2,000 on August 19th. The note came after the Desist and Refrain Order was issued and it was antedated. The note was delivered by Dickens with no explanation except that ''he brought that and said that is what he was going to give us for lending him that money.'' Defendant Dickens, though a witness under section 2055 Code of Civil Procedure and in his own behalf, offered no explanation, merely saying that he did not remember it; ''I don't remember this specifically of taking it over and giving it to her.'' (The other defendants were absent from the trial and no deposition of either one was offered.) It is a fair inference that the note was an effort to cover up a transaction occurring before the Desist and Refrain Order, one which was considered by defendants to be in need of repair. The situation is analogous to those considered in *People* v. *Sidwell, supra,* 27 Cal.2d 121; *People* v. *Whelpton,* 99 Cal.App.2d 828, 831 [222 P.2d 935]; *Strangman* v. *Arc-Saws, Inc.,* 123 Cal.App.2d 620, 624 [267 P.2d 395]; *Taormina* v. *Antelope Mining Corp.,* 110 Cal.App.2d 314, 319 [242 P.2d 665]; *People* v. *McCabe,* 60 Cal.App.2d 492, 498 [141 P.2d 54]. In each of those cases the court looked through the form of a loan and found the sale of a security underneath. In the Sidwell case, *supra,* the court concluded this phase of the discussion, at page 129, as follows: ''In the present case the trial court, upon conflicting but sufficient evidence, impliedly found that the transaction, in substance as well as in form, was within the act. The fact that the evidence amply admits of inferences that in its essential substance such transaction was not within the proscription of the act does not permit us to disturb the trial judge's determination.''

When November 1st (the maturity date of the $4,500 note) arrived there were no funds to pay it. Dickens then had a conversation with Edna ''about additional investment in this enterprise.'' He called at the plaintiff's home and, as she testified ''He told me that they weren't going to be able to return that money and if we had any more that we wanted to make some money with, well, we could put it in too.''

She agreed to put in an additonal $1,000, which she paid him on November 1st. He then took her to the company office where she met defendant Friedgen. Dickens said to him "that we, my sister and my mother and. I, had all been so good and not demanded the note be paid, as it was due, and that we were willing to help them out a little bit more, that wouldn't it be nice or right to give us one per cent of the producer's share of the profit of the picture when it was made, if we left our $3500 in and for the other that we were giving in," and Friedgen agreed. Then Dickens wrote out Exhibit 6 and delivered it to her, bearing the signatures of himself and Friedgen. Upon the letterhead of the corporation, it says: "Nov. 1st 1947 Recd. of Edna Fournier the sum of $1,000.00 to be secured by a note plus intrest in picture of producers share—agreement to be drawn up by and between Edna Fournier and D.F.D. Productions. Alvin T. Dickens. John Raymond Friedgen, Pres." There is no doubt about what this means. Plaintiff was to have an interest in the picture payable out of the producer's share. Two days later Dickens brought to the Voss home a corporate promissory note payable to Edna in the sum of $1,000, and bearing date November 3, 1947. It has no due date and contains in its body this language: "Principal and interest payable in Lawful Money of the United States *As an agreement dated today.*" The italicized portion was typed into a printed form. Again we have no explanation of the delivery of the note. Dickens testified that he might have delivered the note of November 3d "but I don't remember this one." The agreement mentioned in the receipt of November 1st was never presented to or received by plaintiffs. Concerning the phrase, "agreement to be drawn up by and between Edna Fournier and D.F.D. Productions," Dickens testified he had no recollection and did not know what that referred to.

At or about the time that Edna invested the additional $1,000, Helen agreed to put in $500 new money; she delivered it to Dickens on November 5, 1947,[2] and she then received a document written by defendant reading as follows: "Nov. 5-1947 Received of Helen Voss $500.00 Five Hundred dollars, for D.F.D. Productions, and agreement to come from D.F.D. Productions by Alvin T. Dickens." Helen never saw or received any agreement such as mentioned therein.

[2] Ultimately, $50 was repaid to her by Dickens.

When November 1, 1947, arrived plaintiffs held a corporate note for $4,500, which they could have elected to enforce and which the maker could not pay. Dickens called at the Voss home saying, according to Helen's testimony, "they were unable to pay back our original $3,500 that we had loaned them and if I had any more money, I only had $500 left, and I agreed to give him that and we were to receive one percent of the profits of the picture." In consideration of plaintiffs' refraining from enforcing the note and their investing further funds, it was agreed that plaintiffs should have a 1 per cent interest in the producer's share of the profits. ■ The true aspect of Dickens' dealings with plaintiffs now appears on the surface. They take the form of a sale of a one per cent interest in the venture in consideration of the previous investment of $3,500, plus $500 new money.

After Friedgen had suffered a stroke and the business had shut down, Dickens told plaintiffs that one Major Ellis was interested in investing in the picture and for them, when talking to him, to insist upon 1 per cent of the profits.

Dickens himself testified: "No, these were strictly loans. We were to repay the money with the interest on the money and then that other that you mentioned or that was mentioned, the one percent, was to be given if and when the stock was issued." If this be accepted as accurate, the facts fall within the controlling influence of *Strangman* v. *Arc-Saws, Inc., supra,* 123 Cal.App.2d 620, 624, which we quote: "As part consideration for the loan plaintiff was promised one share of stock in the corporation. It is asserted that the condition upon which Alexander was to receive stock was never met and that stock was never issued to plaintiff. There was, however, a conditional promise of stock which the court found was an inducement to the making of the loan. . . .. The transaction clearly involved the issuance of a security as that term is defined by section 25008, Corporations Code." See also: *Cecil B. DeMille Productions* v. *Woolery,* (9th C.C.A.) 61 F.2d 45, 50; *People* v. *Woodson,* 78 Cal.App.2d 132, 136 [177 P.2d 586]; *People* v. *Sidwell, supra,* 27 Cal.2d 121, 127.

The court orally ruled that "it was a security deal" which violated the statute, and the evidence is sufficient to sustain the conclusion.

Appellants assert that the action is barred by limitation, but their reasoning is so brief as to be obscure. The moneys were

paid to defendants on July 15, 1947, August 19, 1947, November 1, 1947, and November 5, 1947. The applicable statute of limitation is to be found through application of *Mary Pickford Co.* v. *Bayly Bros., Inc., supra,* 12 Cal.2d 501, 525, to the facts at bar. The court there said: "Upon a full consideration of the applicable principles of law, it is clear that a person who sells a security impliedly represents that a permit therefor has been secured when one is required by the Corporate Securities Act for such a sale. If this implied representation is false, then it is a negligent misrepresentation which is an actionable fraud, and the buyer's right of action does not accrue until he discovers its falsity unless the seller acted upon information sufficient to justify a reasonable man in concluding that no permit was required. In that event there has been a breach of warranty, but no fraud, and the buyer's cause of action accrues at the date of the sale." (See also *Taormina* v. *Antelope Mining Corp., supra,* 110 Cal.App.2d 314, 320.) There is no room in this instance for an inference that defendants did not know of the necessity for a permit. Plaintiffs' cause of action accrued upon discovery of the falsity of the implied representation of the existence of a permit.

When plaintiffs were trying to collect their money from or through Dickens, he, on one occasion, went out the back door as some of them entered the front. This made them suspicious, so they consulted Mr. Mathes, who was attorney for Dickens and the corporation. He referred them to another attorney. This was near the end of 1950. Some time after August, 1951, plaintiffs consulted Attorney Ray M. Steele (attorney of record herein), who then gave them their first information that no permit had been obtained from the Corporation Commissioner. This action was filed on October 31, 1951. The plea of limitation is without substance.

Judgment affirmed.

Fox, J., concurred.

MOORE, P. J.—I concur. However I enter my protest against the practice of making findings "in the general language of the complaint" when it contains only common counts. It was a generous concession on the part of the Supreme Court nearly a hundred years ago to approve that type of pleading (*Godwin* v. *Stebbins,* 2 Cal. 103, 105; *Freeborn* v. *Glazer,* 10 Cal. 337, 338) when the basis of the action is fraud in any

form. A statement of the facts as originally designed by the Legislature (Code Civ. Proc., § 426; Stats. 1851, ch. 5, p. 56, § 39) would be more in keeping with the universal concept of pleading a cause of action. While it is too late to abuse the common count as a form for stating a claim, yet it is going too far for trial courts to bundle their findings on serious factual issues into a few phrases and start them to the reviewing courts as ''findings.'' I abhor the practice as a careless, hasty, indifferent method for trial courts to pursue. It not only imposes an undeserved burden upon the appellate courts, but, also, it makes no record of the judicial effort of the trial court. Hasten the day when there will be carefully prepared findings on all factual issues.